# In the United States Bankruptcy Court
# for the
# Southern District of Georgia
# Savannah Division

FILED
Samuel L. Kay, Clerk
United States Bankruptcy Court
Savannah, Georgia
By lbarnard at 12:39 pm, Sep 12, 2011

|   |   |   |
|---|---|---|
| In the matter of: | ) | |
| | ) | Chapter 11 Case |
| BRAMPTON PLANTATION, LLC. | ) | |
| | ) | Number <u>10-40963</u> |
| *Debtor* | ) | |

## MEMORANDUM AND ORDER ON VALUATION

Debtor's case was filed May 3, 2010. Debtor was indebted to Branch Banking and Trust Company ("BB&T") in the amount of $25,292,09.53, secured by a tract of land (the "Property") being developed for high end residential use on Hutchinson Island, situated between the North and South channels of the Savannah River directly across from downtown Savannah. BB&T filed a Motion to Dismiss and a Motion for Relief from Stay on May 18, 2010, both of which have been continued numerous times by the parties in order to engage in extensive discovery and lengthy settlement negotiations.

When settlement negotiations failed, BB&T sold its "paper,"—its notes, deeds to secure debt, and related rights—to German American Capital Company ("GAC"), which now pursues the Motion to Dismiss and the Motion for Relief from Stay originally filed by BB&T. The decision regarding the Motion for Relief from Stay is based in part on whether the Debtor has equity in the property. 11 U.S.C. § 362(d)(2)(A). Evaluating that

requires a determination of the value of the collateral. Therefore, the Court scheduled a trial to set the value of GAC's collateral and conducted that trial on July 22, 2011. Each party engaged expert appraisers whose reports were received and reviewed and each of them testified at length.

GAC produced the opinion of Joel Crisler, MAI of Crisler/Morrison and Company. He appraised the Property for a value of $4,233,000.00. Crisler Appraisal, Dckt. No. 150 (July 20, 2011).

Debtor produced the opinion of Clayton Weibel, MAI of Weibel and Associates, who appraised the Property for a value of $32,180,000.00. Weibel Appraisal, Dckt. No. 151 (July 21, 2011).

The Property was purchased in two separate tracts. The main tract was purchased for $7 million[1] in 2003, and an additional tract was purchased for $1 million in 2005. The 2003 deed required the owners to develop a residential development with at least 450 dwelling units adjacent to the Savannah International Trade and Convention Center, the Westin Hotel, and the Savannah Harbor Golf Resort. Crisler, Exhibit B, Dckt. No. 150-4,

---

[1] Except where the precise number is material, I will utilize rounded or approximate numbers throughout this opinion.

p.2 (July 20, 2011). Pursuant to approved plans, Debtor spent $33 million building utilities, streets, and other infrastructure improvements to develop the site, and commenced marketing in 2006. Since that time, 38 lots of the 242 lots in Phase I have been sold. Twenty-five of the thirty-eight lots were sold to insiders or related entities, and no lots have been sold since February 2008.

The lots in Phase I encompass approximately fifty-eight of the ninety-plus acres in the development. The remaining thirty-six acres in Phase II are sited and approved for development and have some infrastructure in place, but the subdivision lot lines have not been recorded. They are generally referred to by the parties as "excess property," and it is the appraisal of the excess property which yields the greatest differential in values, as will be discussed later.

As to Phase I, the appraisers did not differ as substantially in their opinions as they did on Phase II. Crisler concluded a value of $4.8[2] million and Weibel concluded a value of $6.5 million. Although their reports vary slightly regarding the absorption periods necessary to sell the 203 remaining lots and the applicable discount rate to reduce gross value to present value, the major point of contention is in the average projected lot prices. Crisler

---

[2] This number presupposes completion of the clubhouse at a cost of $1.5 million dollars. Crisler, at 44.

assumes an average per lot price of $67,000.00, while Weibel uses $110,000.00.

Crisler projected the per lot price by calculating the anticipated per-square-foot cost to build a finished home of the quality and size anticipated by Debtor's marketing plan, and then multiplying the total cost by 15%—his estimate of the typical ratio of land value to total home cost in comparable developments—which yields an average per lot price of $67,000.00. Crisler, at 73-75. Crisler's analysis of comparable lot sales in similar residential areas revealed declining sales volume and prices which support these numbers. Id. at 66-69.

Weibel utilized comparables with average per lot prices ranging from $29,900.00 to $200,000.00 and a median price of $65,000.00. Weibel, at 27. He found the average lot price after adjustments to be $110,000. Id. at 71. Weibel was unable to articulate how the subject lots are worth $110,000.00 other than the fact that the average, not the median price, of the comparables was $110,000.00. Those comparables, however, included an average lot price of $200,000.00 in Telfair Plantation in Jasper County, South Carolina, which I do not find to be a meaningful comparable. In that development, the average lot size exceeds that of the Property by more than six times, and Weibel made no adjustment for this difference in size and home density. See id. at 72, 78. Disregarding this comparable or utilizing his median rather than average lot price brings the number very close to Crisler's.

I therefore conclude that the Crisler appraisal is more persuasive, and because I accept Crisler's average lot price of $67,000.00 as the better projection, I accept the remainder of his report as to Phase I.

The appraisals of Phase II reveal the widest disagreement between the two experts. Crisler treats the lots there as part of a unified inventory of lots which will be marketed sequentially over an absorption period of thirteen years. After applying similar average lot prices, less costs of sale, taxes, holding costs, and discount factors, he reaches his final "As Is" value of the Property of $4.233 million.[3] Crisler's valuation of Phases I and II is lower than his $4.8 million valuation of Phase I of the Property only because the $1.5 million completion costs of the clubhouse were not deducted from his Phase I value. Crisler, at 79.

His review of bulk sales of lots from 2008-2010 shows that bulk lot sales are pricing at a range of 16%-50% of the retail prices for those lots. Crisler's valuation of $4.233 million is 35% of the retail price of the lots in Phase II and is well supported by the real world experience of marketing multiple home-sites. Id. at 86-91. This additional comparison bolsters his primary valuation analysis.

---

[3] Crisler acknowledges that he appraised this property last year for $8.4 million. His current valuation of $4.2 million is subject to the assumption that the clubhouse, now partially finished, will be completed at a cost of $1.5 million. Crisler, at 44.

5

Weibel takes a vastly different approach. He is uncomfortable making projections about lot prices, rates of sale, and other critical components of the Crisler analysis for Phase II lots (2018-2024). Because he feels the time horizon is too speculative, he believes Phase II should be priced for sale as an entire tract. His analysis uses comparable sales of raw land to value this thirty-six acres. He then adds to that value the prorated amount of his estimated value of infrastructure improvements to date, $29.5 million. Weibel, at 6, 67. He divides that number by the total number of dwelling units in both phases to find the amount of infrastructure costs attributable to the number of home sites in Phase II, adds that to the raw land value, and concludes that the excess property in Phase II is worth $26 million. Id. at 3. In doing so, Weibel assumes 185 condominiums will be constructed on both Parcel C and Parcel D, although Parcel D is already platted for 10 single family homes. Weibel contemplates Phase II property being sold contemporaneously with Phase I lots, not after the seven-year sell out of Phase I.

I have reviewed Weibel's analysis closely and cannot accept it. While I am quick to agree that Crisler's thirteen-year window for projected lot sales is so long a period as to be nearly speculative, that is the nature of the current real estate environment. Still, I cannot accept Weibel's proposed alternative for the following reasons:

1. His comparables are unconvincing for the reasons noted above, and the idea that thirty-six acres of partially developed land is worth four times

>   the value of fifty-eight acres of fully developed land is inconceivable.
>
> 2. He assumes the market will pay the full cost of infrastructure, but experience to date demonstrates otherwise. The preexisting Phase I lots have not sold, and when they do sell, they will sell for a fair market value, regardless of how much the infrastructure may have cost.
>
> 3. His assumptions as to the condo tracts are unsupported by the current infrastructure and zoning. Parcel D is already platted for 10 single family homes, not a high-rise condominium building of 185 units. Parcel C is not platted for any particular use and its infrastructure is only partially complete.

I truly question how property subdivided, with infrastructure in place at a total cost of $33 million can be worth barely 13% of that number, no matter how disastrous the real estate market collapse. However, it is clear that the Weibel value is wildly optimistic, and fundamentally unsupported by solid facts. No evidence exists to support adjusting either opinion toward a middle ground. While the precipitous drop from Crisler's $8.4 million valuation made last year was not explained in detail, Crisler did say that prices and absorption factors have worsened since then, and that testimony was not challenged. I have two opinions rendered by experienced and reputable appraisers, and by a preponderance of the evidence, I find the Crisler analysis to be better.

## ORDER

For the foregoing reasons, IT IS THE ORDER OF THIS COURT that the

value of the Property is $4,233,000.00.

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia
This _____ day of September, 2011.